UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JEREMY ROBERTSON

CIVIL ACTION

VERSUS

NO. 16-853-EWD
(CONSENT)

COMMISSIONER OF THE
SOCIAL SECURITY
ADMINISTRATION

**RULING**

Plaintiff, Jeremy Robertson ("Plaintiff"), brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for supplemental security income ("SSI").[1] Plaintiff has filed Memorandum in Support of his appeal,[2] and the Commissioner has filed an Opposition Memorandum.[3]

Based on the applicable standard of review under § 405(g) and the analysis which follows, the court **AFFIRMS**[4] the Commissioner's decision and **DISMISSES** Plaintiff's appeal.

## I.    Procedural History

Plaintiff filed an application for SSI[5] alleging disability beginning June 24, 2003[6] due to psychological disorders, specifically, conduct disorder, borderline intelligence, ADHD, and

---

[1] *See*, AR pp. 121-126 (application for SSI); AR pp. 1-6 (Notice of Appeals Council Action).  References to documents filed in this case are designated by "(R. Doc. [docket entry number(s)] p. [page number(s)]."  References to the record of administrative proceedings filed in this case are designated by "(AR [page number(s)]."

[2] R. Doc. 13.

[3] R. Doc. 16.

[4] The parties consented to proceed before the undersigned United States Magistrate Judge, R. Doc. 11, and on March 21, 2018, an Order of Reference was entered by the District Judge referring this matter to conduct "all further proceedings and the entry of judgment in accordance with 28 USC 636(c)…."  R. Doc. 14.

[5] AR pp. 121-126.

[6] AR p. 121.

depression.[7]  Plaintiff's claim was initially denied on September 24, 2014.[8]  Thereafter Plaintiff requested a hearing before an ALJ.[9]  A hearing was held on August 25, 2015 at which Plaintiff, represented by counsel, testified.[10]

On October 29, 2015, the ALJ issued a notice of unfavorable decision.[11]  Thereafter, Plaintiff requested review by the Appeals Council.[12]  On November 23, 2016, the Appeals Council denied Plaintiff's request for review.[13]  On December 19, 2016, Plaintiff filed this appeal.[14]  Accordingly, Plaintiff exhausted his administrative remedies before timely filing this action for judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial review.[15]

## II.    Standard of Review

Under 42 U.S.C. § 405(g), judicial review of a final decision of the Commissioner denying disability benefits is limited to two inquiries: (1) whether substantial evidence exists in the record as a whole to support the Commissioner's findings, and (2) whether the Commissioner's final decision applies the proper legal standards.[16]  If the Commissioner fails to apply the correct legal

---

[7] *See*, AR p. 43-44.

[8] AR pp. 43-53.

[9] AR pp. 79-81.

[10] AR pp. 14-41.

[11] AR pp. 54-69.

[12] AR pp 12.

[13] AR pp. 1-6.

[14] R. Doc. 1.  There was a significant delay between the filing of Plaintiff's Complaint and service on the Commissioner.  *See*, R. Docs. 8-10.

[15] *See*, 20 C.F.R. § 404.981 ("The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision.  The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised.  You may file an action in a Federal district court within 60 days after the date you receive notice of the Appeals Council's action.").

[16] *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal.[17]

### III.    The ALJ's Decision

A claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.[18]  The regulations require the ALJ to apply a five-step sequential evaluation to each claim for benefits.[19]  In the five-step sequence used to evaluate claims the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe medically determinable impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in Appendix 1 of the regulations; (4) the impairment(s) prevents the claimant from performing past relevant work; and, (5) the impairment(s) prevents the claimant from doing any other work.[20]

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability.[21]  If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity ("RFC"), age, education and past work experience, that he or she is capable of performing other work.[22]  If the Commissioner proves other work exists which the claimant can perform, the

---

[17] *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

[18] 20 C.F.R. §§ 404.1505; 416.905.

[19] 20 C.F.R. §§ 404.1520; 416.920.

[20] *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

[21] *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

[22] 20 C.F.R § 404.1520(g)(1).

claimant is given the chance to prove that he or she cannot, in fact, perform that work.[23]

Here, the ALJ determined that Plaintiff had the severe impairments of conduct disorder and learning disorder,[24] that Plaintiff did not meet Listing 12.05C (outlining the requirements for presumptive disability at step three of the evaluation process based on mental retardation),[25] and that Plaintiff had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels" but with nonexertional limitations as follows: "[c]an understand, remember and carry out simple one and two step instructions with less than occasional direct contact with the general public and incidental contact with co-workers and supervisors."[26] Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform such that he was not disabled.[27]

## IV. Plaintiff's Allegations of Error[28]

First, Plaintiff argues that the ALJ erred in failing to find that Plaintiff was disabled at step three of the sequential evaluation process pursuant to 20 CFR chap. III, pt. 404, subpt. P, app. 1, Listing 12.05C ("Listing 12.05C") based on Plaintiff's severe learning disorder.[29] Second, Plaintiff contends that the ALJ erred in relying on the first, rather than second, hypothetical posed to the VE during the August 25, 2015 hearing in making the step five determination that there were

---

[23] *Muse*, 925 F.2d at 789.

[24] AR p. 59.

[25] AR p. 60.

[26] AR p. 62.

[27] AR pp. 68-69.

[28] Consistent with the sequential evaluation process, this Report and Recommendation considers Plaintiff's second and third allegations of error in reverse order.

[29] R. Doc. 13, pp. 6-11.

other jobs in the national economy that Plaintiff was able to perform.[30]  Third, Plaintiff contends

that the ALJ erred in her findings regarding Plaintiff's capacity to interact appropriately with co-

workers and supervisors.[31]

## V.      Law and Analysis

### A. Substantial Evidence Supports the ALJ's Determination that Plaintiff Does Not Meet Listing 12.05C

Both Plaintiff and the Commissioner rely on Listing 12.05C in their briefing.  Although

Listing 12.05 was amended effective January 2, 2017 and Paragraph C has been removed, "[t]he

amended Listing generally applies to claims filed on or after January 1, 2017 and is not applicable

to this case."[32]  The regulations in effect at the time the ALJ issued her decision included Listing

12.05C, which provided as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general  intellectual functioning with deficits in adaptive functioning  initially  manifested  during  the  developmental  period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

---

[30] R. Doc. 13, pp. 11-16.

[31] R. Doc. 13, pp. 16-20.  Plaintiff also asserts that the ALJ erroneously found Plaintiff's adjustment disorder, anxiety and depression, impulse control disorder, ADHD and antisocial behavior "non-severe" and that limitations associated with these impairments "were not factored in, either singulary or in combination, with plaintiff's other impairments." R.Doc. 13, p. 5.  In her ruling, the ALJ explained that while Plaintiff was "reportedly diagnosed in about June 2014 with adjustment disorder and prescribed medications for anxiety and depression," Plaintiff "did not submit any corroborating treatment records to support significant or persistent anxiety or depressive symptoms, and admittedly never started medication.  Thus, the claimant has not proven the existence of any other 'medically determinable' mental impairment."  AR p. 59.  The court agrees that the administrative record contains no treatment records supporting symptoms of anxiety or depression.  Additionally, Dr. Brown's report states that claimant's mother denied that he had any history of inpatient psychiatric treatment.  AR p. 209.  Moreover, to the extent Plaintiff suffers from other "severe" mental impairments such as adjustment disorder, anxiety, depression, impulse control disorder, ADHD, or antisocial behavior, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work with nonexertional limitations to simple one and two step instructions and limited interaction with the general public, co-workers, and supervisors.  AR p. 62.  Such nonexertional limitations would appear to address any mental limitations stemming from additional, but related, mental or psychological impairments.

[32] *Williams v. Berryhill*, Civil Action No. 2:16-cv-01367, 2018 WL 1006057, at * 9 (W.D. La. Jan. 17, 2018) (citing Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 2016 WL 5431732 (Sept. 26, 2016) and explaining that "[t]he SSA stated that it will use the new rules on or after their effective date in any case in which it makes a determination or decision. The SSA expects the Federal courts will review its final decisions using the rules that were in effect at the time it issues the decisions.")).

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.[33]

Plaintiff has the burden of establishing that he meets a Listing.[34] The criteria for the Listings are "demanding and stringent."[35] "Plaintiff's subjective complaints, without objective medical evidence, are insufficient to establish disability."[36] "For a claimant to show that his

---

[33] See, *Randall v. Astrue*, 570 F.3d 651, 653 (5th Cir. 2009) (quoting 20 CFR chap. III, pt. 404, subpt. P, app. 1, Listing 12.05). Plaintiff argues only that the ALJ erred in failing to find he met the requirements of Listing 12.05C. Plaintiff does not contend that he should be considered disabled based on any other subsection of Listing 12.05.

[34] See, *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); 20 C.F.R. § 404.1520(d).

[35] *Siewert v. Colvin*, Civil Action No. 15-476, 2016 WL 7478968, at * 6 (M.D. La. Dec. 29, 2016) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)).

[36] *Id*. (citing 20 C.F.R. §§ 404.1508, 404.1528, 404.1529).

impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[37] Here, to establish Plaintiff is disabled pursuant to Listing 12.05C, Plaintiff must "separately satisfy both the diagnostic description, requiring evidence of sub-average intellectual functioning during the developmental period, and the criteria set forth in paragraph C…."[38]

### i. Substantial Evidence Supports ALJ's Evaluation of Plaintiff's IQ Testing Scores

Listing 12.05C requires, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[39] Plaintiff contends that the ALJ should have relied on IQ scores reported by Dr. Ivory Toldson, and that higher IQ scores reported by Dr. Jessica Brown are not valid or reliable.

---

[37] *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

[38] *Williams v. Berryhill*, 2018 WL 1006057 at * 10 (citing *Randall*, 570 F.3d at 661-662). *See also*, *Parker v. Astrue*, Civil Action No. 11-294, 2012 WL 5384821, at * 4 (M.D. La. Nov. 1, 2012) ("the Fifth Circuit held that to establish disability under Listing 12.05C., a claimant has the burden of first demonstrating that his impairment satisfies the introductory paragraph's diagnostic description, and then showing the severity criteria of paragraph A, B, C or D."); *Morris v. Colvin*, Civil Action No. 13-66, 2014 WL 1415004, at * 6 (M.D. La. April 11, 2014) (In *Randall v. Astrue*, 570 F.3d 651 (5th Cir.2009), the Fifth Circuit held that to establish disability under Listing 12.05C., a claimant has the burden of showing that his impairment satisfies the introductory paragraph's diagnostic description, and demonstrating the severity criteria of paragraph A, B, C or D. Thus, to establish disability under Listing 12.05C, the claimant must satisfy not only the requirements of Subsection C itself—low IQ scores and another physical or mental impairment, but also the requirements of the 'introductory paragraph'—the claimant has 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.'") (internal citation omitted).

[39] Plaintiff argues that the ALJ's finding that Plaintiff has the severe impairment of conduct disorder meets Listing 12.05C's requirement of an "additional and significant work-related limitation of function." R. Doc. 13, p. 10. The Commissioner does not directly address this prong of Listing 12.05C. However, courts in this Circuit have expressed a willingness to consider a second "severe" impairment at step two of the sequential evaluation to meet the Listing 12.05C requirement. *See*, *Cargill v. Colvin*, 2:12-cv-183, 2013 WL 5526620, at * 5 (N.D. Tex. Sept. 30, 2013) ("The Fifth Circuit has never explicitly denied, adopted, or acknowledged that the Commissioner's use of 'significant' in Listing 12.05C is equivalent to its use of 'severe' in 20 C.F.R. § 404.1520(c). Other circuit courts and courts in this district, however, have so held….") (collecting cases, internal citations omitted); *Parker v. Astrue*, Civil Action No. 11-294, 2012 WL 5384821, at * 4, n. 11 (M.D. La. Nov. 1, 2012) ("The Fifth Circuit has not yet addressed whether a finding at step two that an impairment is severe is the equivalent of the 'significant work-related limitation of function' requirement of the second part of paragraph C of 12.05. 'Since the Commissioner did not argue that the plaintiff's severe mental impairment does not satisfy the second requirement of paragraph C, for purposes of this ruling the court accepts that it does so.").

In a September 15, 2010 Psychological Evaluation, Dr. Toldson reported a Full Scale IQ ("FSIQ") of 65 based on the Wechsler Adult Intelligence Scale-Fourth Edition test.[40] In a December 13, 2008 Psychological Evaluation, Dr. Brown reported a FSIQ of 75 based on the Wechsler Abbreviated Scale of Intelligence test.[41] In her October 29, 2015 Ruling, the ALJ rejected Plaintiff's argument that the FSIQ score of 75 "should be discounted as invalid because the evaluator, Dr. Jessica Brown, related that the claimant was not fully cooperative with the evaluation."[42] In rejecting Plaintiff's argument, the ALJ noted consistent reports (including from Dr. Toldson) regarding Plaintiff's less-than-full effort with respect to the testing:

> the claimant's performance was less than consistent in each of the documented evaluations; he was described as blasé by Dr. Brown, suboptimal by Dr. Thompson [*sic*], and spurious by Dr. James Van Hook. It is further noted that even with the noted difficulties, including in establishing rapport, Dr. Brown did not conclude his test result was invalid.[43]

---

[40] AR p. 222. Per Dr. Toldson's report, the full scale composite score of 65 was "derived from 10 subtest scores." AR p. 222. Composite scores for verbal comprehension (70), perceptual reasoning (69), working memory (71), and processing speed (71) are also reported. AR pp. 222-223. There is no explanation in the report as to how the lower full scale composite score was reached in light of the higher scores in verbal comprehension, perceptual reasoning, working memory, and processing speed.

[41] AR p. 211.

[42] AR p. 60. *See also*, AR pp. 40-41 (transcript of August 25, 2015 hearing wherein Plaintiff's counsel asserted that Dr. Brown's FSIQ test results were "absolutely invalid" "[b]ecause his responses, using his own words, Your Honor, was flipped [*sic*], they were superficial, and he was reluctant to even participate in the study at that time. In other words there was not rapport developed between Mr. Robertson and that examiner at that time. When it was just the opposite with Dr. Toson [*sic*].").

[43] AR p. 60. Dr. Toldson noted in his evaluation that Plaintiff "often gave up before giving his best effort on testing tasks. With coaching, he would attempt things he thought he could not complete. Overall, results were considered reliable and valid." AR p. 223. Dr. Toldson also reported that Plaintiff "asked how long the examination process would take and acted as if he had somewhere more important to be." AR p. 220. Dr. Brown noted in her evaluation that Plaintiff "was quiet and seemingly reluctant to participate. Jeremy tended to answer in brief and sometimes flippant responses. It was difficult to build rapport with Jeremy. He did not appear to be interested in the evaluation. His effort on formal testing was questionable at times, as he tended to rush through parts of the tests and gave each item only superficial consideration." AR p. 211. Dr. Brown also reported that Plaintiff "tended to be blasé and seemed unaffected." AR p. 211. Based on a September 5, 2014 psychological consultative examination, Dr. James Van Hook similarly noted that Plaintiff was "likely overreporting indicating levels of depression and anxiety" and that Plaintiff's "persistence was poor and he seemed to give up easily." AR pp. 235-236. Dr. Van Hook opined that "[t]he results of the examination were felt to be a spuriously low estimate of his cognitive functioning and an unreliable depiction of his current level of socioemotional/behavioral distress." AR p. 236. Dr. Van Hook further reported that Plaintiff

"An ALJ may make factual determinations on the validity of I.Q. tests."[44]   Plaintiff

recognizes that "[i]n general, ALJs are to choose those IQ scores most supported by the record"[45]

and argues that the ALJ should have relied on the scores reported by Dr. Ivory Toldson.[46]   This

court has explained that "[t]he ALJ is not required to accept the reported scores.  He may decide

not to fully credit them if there is evidence that shows they are unreliable, invalid, or inconsistent

with other evidence contained in the record."[47]   Other courts in this Circuit have considered

evidence of a claimant's suboptimal effort or participation when determining whether substantial

evidence supports the ALJ's determination of the validity of an IQ score.[48]   Here, both Dr. Toldson

and Dr. Brown noted in their psychological evaluations that Plaintiff appeared to give less-than-

full effort during testing, and the ALJ could appropriately consider Plaintiff's effort when

determining the credit to be given to the scores.[49]

---

"showed evidence of inconsistence effort" and exhibited "likely symptom magnification and suboptimal effort."  AR
pp. 236-237.

[44] *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

[45] R. Doc. 13, p. 7.

[46] R. Doc. 13, p. 7 ("In this present case, the ALJ rejected the validity of the IQ test scores provided by Dr. Toldson
and, thereby effectively rejected the applicability of Listing 12.50C (*sic*).").

[47] *Morris v. Colvin*, Civil Action No. 13-66, 2014 WL 1415004, at * 6 (M.D. La. April 11, 2014).

[48] *See*, *Henderson v. Astrue*, 4:07-cv-093, 2008 WL 269450, at * 6 (N.D. Tex. Jan. 30, 2008) (explaining that "an ALJ
may make factual determinations about the validity of IQ test, and may reject IQ scores that are inconsistent with the
rest of the record" and finding "[i]t was not unreasonable for the ALJ to find that Henderson's sub-optimal
participation on more than one occasion during the multi-phase vocational assessment with Goodwill Industries cast
doubt on the validity of the results obtained during that process" and that such sub-optimal participation in evaluations
as well as claimant's work and overall history provided substantial evidence to support the ALJ's determination that
claimant's "IQ scores [FSIQ of 62] did not reflect his true level of functioning [that the record reflected a higher level
of functioning than claimant's IQ scores indicated].").

[49] Plaintiff additionally argues, without supporting citation, that Dr. Brown's failure to address the issues of validity
and reliability in her report contravenes Listing 12.05C's requirement that IQ test results must be valid and that the
ALJ was required to consider the "meaning and/or relative value of the 'full' Wechsler IQ test, compared to the
abbreviated version employed by Dr. Brown."  R. Doc. 13, p. 9.  Plaintiff apparently asserts that it was error for the
ALJ to presume Dr. Brown's reported score was valid in the absence of an explicit statement in Dr. Brown's report
regarding validity.  While the court agrees that Dr. Brown did not explicitly state that she considered the IQ test results
valid, there is no indication in Dr. Brown's report that she considered the testing results to be invalid or inadequate.
Further, Dr. Brown's inclusion of the result in her report would indicate an opposite presumption, *i.e.*, that Dr. Brown
believed the IQ test result was reportable (valid and reliable) without explanation or qualifiers.

Although the ALJ did not make an explicit finding accepting or rejecting either IQ score, it appears that the ALJ declined to give controlling weight to Dr. Toldson's lower score based on consistent evidence in the record that Plaintiff was not exerting his full effort.[50] Moreover, the ALJ went on to consider Plaintiff's daily activities and behavior and ultimately found "that the balance of the evidence fails to support a diagnosis of mild mental retardation."[51] "As with any medical evidence, the ALJ is not 'required to accept a claimant's IQ score. Rather, the ALJ should examine the record to determine whether the proffered IQ score is reliable–that is, consistent with the claimant's daily activities and behavior. An ALJ may reject IQ scores if they are inconsistent with the record.'"[52] As discussed below, substantial evidence supports the ALJ's determinations regarding Plaintiff's abilities. Accordingly, the ALJ's failure to find Dr. Toldson's FSIQ score of 65 controlling was not reversible error.[53]

### ii. Substantial Evidence Supports the ALJ's Determination that Plaintiff Exhibited a Significant Degree of Adaptive Functioning

In addition to establishing that Plaintiff meets the requirements of Listing 12.05C, Plaintiff must also separately satisfy the diagnostic description of Listing 12.05 which requires a showing of "subaverage general intellectual functioning with deficits in adaptive functioning initially

---

[50] The court further notes that the Commissioner's point in Opposition – that "Plaintiff was able to score a full-scale IQ score of 75, despite his lack of effort" – is persuasive. R. Doc. 16, p. 7.

[51] AR p. 60.

[52] *Ledet v. Colvin*, Civil Action No. 15-4651, 2016 WL 3079026, at * 8 (E.D. La. May 3, 2016) (quoting *McGee v. Astrue*, 291 Fed. Appx. 783, 787 (8th Cir. 2008) (collecting cases)); *see also*, *Winn v. Social Security Administration*, Civil Action No. 12-2690, 2013 WL 5507289, at * 11 (E.D. La. Oct. 2, 2013) ("As with any medical evidence, the ALJ is not 'required to accept a claimant's IQ score. Rather, the ALJ should examine the record to determine whether the proffered IQ score is reliable-that is, consistent with the claimant's daily activities and behavior. An ALJ may reject IQ scores if they are inconsistent with the record.'") (internal citations omitted).

[53] Even assuming *arguendo* that Plaintiff's IQ score as reported by Dr. Toldson satisfied Listing 12.05C, substantial evidence supports the ALJ's determination regarding Plaintiff's "significant degree of adaptive functioning." AR p. 60. In order to establish disability pursuant to Listing 12.05C, Plaintiff has the burden of establishing each element of the Listing (including that he meets the diagnostic criteria of the introductory paragraph). *Randall*, 570 F.3d at 653. As noted below, because substantial evidence supports a determination that Plaintiff cannot meet his burden of establishing "subaverage general intellectual functioning with deficits in adaptive functioning," Plaintiff does not meet Listing 12.05C regardless of the controlling IQ score.

manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[54]  Although Listing 12.05 does not define "adaptive functioning," "the Fifth Circuit has indicated that the definition of 'adaptive activities' found in § 12.00(C)(1) should be used. Thus, adaptive functioning encompasses adaptive activities 'such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'"[55]

In her ruling, the ALJ explained that:

> the balance of evidence fails to support a diagnosis of mild mental retardation, as evidenced by claimant's ability to score within the average to borderline average range on other subtest sections and his significant degree of adaptive functioning.  As to the latter, the claimant admitted throughout the record that he drove a vehicle, cared for his two young children while his girlfriend worked, and performed a variety of household chores.  It is also noted that Dr. Thompson [sic] qualified the mild mental retardation diagnosis as provisional and concluded that the claimant retained the ability to perform a large range of mental functional activities.[56]

Substantial evidence supports the ALJ's conclusion regarding Plaintiff's level of adaptive functioning.

---

[54] *Randall*, 570 F.3d 651 at 653.

[55] *Parker*, 2012 WL 5384821, at * 4 (citing *Arce v. Barnhart*, 185 Fed. Appx. 437 (5th Cir. 2006) (unpubl.)).  Plaintiff asserts in his Memorandum in Support of Appeal that he has a history of criminal behavior and was previously found insane "from a criminal insanity commission."  R. Doc. 13, p. 2.  No records from the referenced sanity commission are included in the administrative record.  It appears that in 2008, during the first psychological screening by Dr. Jessica Brown, these records were, for some reason, unavailable.  Dr. Brown noted in her report that the "sanity commission report was not available and could not be located for review at the time of this evaluation.  It remains somewhat unclear what was the basis of determining this youth to be incompetent" and that there "was no evidence to indicate that Jeremy had been referred to the juvenile competency restoration services managed though the Department of Health and Hospitals."  AR pp. 212-213 & 210.

[56] AR p. 60 (citations to administrative record omitted).

During a December 12, 2008 psychological evaluation by Dr. Brown, Plaintiff reported that he had a good relationship with his girlfriend,[57] and his mother reported Plaintiff's strengths to include fixing things and working with tools.[58] Dr. Brown noted that while many of the subtest results "fell into the extremely low or deficit range of functioning, [Plaintiff] also performed at an average or borderline level of functioning on several of the subtests."[59] Despite her diagnoses of conduct disorder, borderline intellectual functioning, and antisocial personality disorder traits, Dr. Brown concluded that Plaintiff "has adequate functioning in several life areas. He has been able to maintain a relationship with a 25-year-old woman and produce a daughter from this relationship. He also appears to have been able to persuade and sometimes pressure his mother. A review of his record would also indicate that he has had sufficient savvy to avoid consequences for a variety of negative behaviors in which he has been implicated."[60]

Similarly, per Dr. Toldson's September 2010 report, Plaintiff reported that "he has had anger problems since childhood" but that he "learned to deal with it better in adulthood" by walking away, avoiding difficult situations, or reading the Bible.[61] Dr. Toldson reported that Plaintiff was "living with the mother of his 2 daughters; ages 2 and 8 months" and that Plaintiff would "like to return to school to earn his GED, but…he cannot go to school because of a lack of childcare. The claimant keeps the children while his companion works."[62] Plaintiff reported that

---

[57] AR p. 209.

[58] AR p. 208 ("she [Plaintiff's mother], however, stated that Jeremy appears to have a specific strength at fixing things. She described him as being good with tools, mechanics, and making repairs.").

[59] AR p. 210.

[60] AR p. 213.

[61] AR p. 219.

[62] AR p. 220. Per Dr. Toldson's report, Plaintiff stopped school in the 9th grade because he was arrested. AR p. 220. Plaintiff also reported that while he took speech therapy in elementary school, he did not have special education. AR p. 220. *See also*, AR p. 235 (Dr. Van Hook Report; noting that Plaintiff "completed 8 years of education and he said that he does not know his exceptionality he said that he received speech therapy.").

in the morning, he "gets his daughters ready, takes a shower, and then goes to his grandmother's house"[63] and that "[i]t lifts his spirits when he wakes up and gets to see his 'little girls.'"[64] Plaintiff reportedly had a few friends, with whom he enjoyed talking or playing basketball,[65] and Dr. Toldson reported that Plaintiff exhibited "a socially mature level of thinking."[66]

During a September 5, 2014 psychological consultative examination with Dr. Van Hook, Plaintiff reported that he was living with his girlfriend,[67] was able to dress and bathe himself,[68] and that he was able to mop, sweep, cut grass, and "wash dishes some of the time."[69] Plaintiff also reported that he was able to use public transportation in the form of calling a cab or riding a bus and was able to drive.[70] Dr. Van Hook found that Plaintiff exhibited "[r]easonable safety and hazard awareness."[71]

Plaintiff argues that medical reports submitted by both Dr. Brown and Dr. Toldson support a finding that Plaintiff exhibited subaverage general intellectual functioning with deficits in adaptive functioning.[72] However, both Dr. Toldson and Dr. Brown noted that Plaintiff presented

---

[63] AR p. 220.

[64] AR p. 221.

[65] AR p. 220.

[66] AR p. 221.

[67] AR p. 235.

[68] AR p. 237.

[69] AR p. 236.

[70] AR p. 235 (Plaintiff "is able to drive but has never possessed a DL."); Plaintiff also reported he was able to drive in his Adult Function Report. AR p. 156.

[71] AR p. 236. *See also,* AR p. 237 ("Adaption per self-report is fair to marginal – he can still care from some domestic tasks and utilize public means of transportation.").

[72] R. Doc. 13, pp. 10-11. Plaintiff also cites "a GAF of 50" set out in Dr. Toldson's report and asserts that such a score "connotes 'serious symptoms…or any serious impairment in social, occupational, or school functioning….'" *See,* R. Doc. 13, p. 11 and AR p. 223. The Commissioner has determined that GAF scores do not have a "direct correlation to the severity requirements of the mental disorders listings." 65 Fed. Reg. 50,746, 50,765-66 (Aug. 21, 2000). Courts have reasoned that "it would be an error for an administrative law judge to focus on a doctor's assessed GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical evidence. Simply put, an administrative law judge cannot draw a reliable inference from a single GAF score, standing alone." *Locure v. Colvin*, Civil Action No. 14-1318, 2015 WL 1505903, at *11 (E.D. La. April 1, 2015) (quoting *Martinez v. Colvin*, Civil Action No. 13-

in a normal manner,[73] and both (as described above) reported Plaintiff's abilities with respect to daily functioning. Similar levels of daily functioning were also reported by Dr. Van Hook. Accordingly, substantial evidence supports the ALJ's determination regarding Plaintiff's "significant degree of adaptive functioning."[74]

## B. Substantial Evidence Supports the ALJ's Determination of Plaintiff's Residual Functional Capacity

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."[75] The ALJ's RFC determination can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her

---

30124, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014)). There is no indication in Dr. Toldson's report regarding the basis for the GAF score. *See*, *Ray v. Barnhart*, 163 Fed. Appx 308, 313 (5th Cir. 2006) (psychologist's opinion was properly discredited where his report did "not include an explanation for the GAF rating" given to claimant). Accordingly, the court does not find Plaintiff's GAF score, recorded without explanation or other supporting details, sufficient to require reversal or remand of the ALJ's decision.

[73] Dr. Brown noted that Plaintiff's "grooming and hygiene were intact." AR p. 210. Dr. Toldson reported that Plaintiff "was competent as a reciprocal conversationalist" and that his "[d]ress, grooming and hygiene were kempt." AR p. 220. Although Dr. Van Hook reported that Plaintiff presented "in a questionable fashion" with respect to symptom distortion/magnification, Dr. Van Hook noted with respect to Plaintiff's mental status that Plaintiff "had no difficulty regulating his affect during the course of this examination." AR pp. 235-236. Dr. Van Hook also noted with respect to Plaintiff's appearance that Plaintiff "was slender, adequate in appearance, and had adequate hygiene at the time of the interview." AR p. 235.

[74] AR p. 60. *See*, *Randall v. Astrue*, 570 F.3d 651, 662 (5th Cir. 2009) ("After reviewing the record that was before the ALJ, we agree that her ultimate finding as to Randall's adaptive functioning was backed by substantial evidence. In particular, the ALJ was entitled to rely on the clinical psychologists' specific analysis of Randall's physical and mental capabilities, including the determination that she suffered from only 'mild/borderline' adaptive retardation and that her impairments 'would not preclude gainful competitive employment.'"); *Parker v. Astrue*, Civil Action No. 11-294, 2012 WL 5384821, at * 5-6 (M.D. La. Nov. 1, 2012) (substantial evidence supported finding that claimant did not have deficits in adaptive functioning where claimant was in job corps for two years and learned how to operate heavy equipment, reported that he could prepare meals, clean his house, wash dishes, shop for groceries, attend church, and use public transportation and psychiatric evaluation noted claimant's strengths as participation in hobbies and social activities, maintaining employment, and the ability to adapt to stressful life circumstances); *Winn v. Social Security Administration*, Civil Action No. 12-2690, 2013 WL 5507289, at * 10 (E.D. La. Oct. 2, 2013) ("Plaintiff's activities, including her educational and employment history, are inconsistent with mental retardation characterized by significantly subaverage general intellectual functioning with significant deficits in adaptive functioning."); *Henderson v. Astrue*, 4:07-cv-093, 2008 WL 269450, at * 6, n.3 (N.D. Tex. Jan. 30, 2008) ("Adaptive functioning refers to how effectively a person copes with common life demands and how well they meet the expected standards of personal independence.").

[75] *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

decision or all the evidence that he or she rejected.[76]  A reviewing court must defer to the ALJ's

decision when substantial evidence supports it, even if the court would reach a different conclusion

based on the evidence in the record.[77]  The court "may only scrutinize the record" and take into

account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's

decision.[78]  Accordingly, a "no substantial evidence" finding is appropriate only if there is a

conspicuous absence of credible evidentiary choices or no contrary medical findings to support the

ALJ's decision.[79]

Plaintiff argues that the ALJ erred in her determination that Plaintiff retained the capacity

for routine interactions with co-workers and supervisors.  Plaintiff contends that the ALJ

inappropriately relied on the conclusions of Dr. William Ferrell, a non-examining state

psychologist, in finding that Plaintiff had moderate limitations in his ability to interact with co-

workers and supervisors, and that such moderate limitations are inconsistent with Plaintiff's

diagnoses of severe conduct disorder and antisocial behavior.[80]  Based on various doctor's reports,

Plaintiff contends that the ALJ "did not incorporate his conduct disorder and associated symptoms

into either his RFC or into her ultimate conclusions"[81]  In her opinion, the ALJ determined that

Plaintiff had the RFC:

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: Can understand, remember and
> carry out simple one and two step instructions with less than

---

[76] *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

[77] *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[78] *Leggett*, 67 F.3d at 564.

[79] *Johnson*, 864 F.2d at 343-44.

[80] R. Doc. 13, p. 17.

[81] R. Doc. 13, p. 18.

occasional contact with the general public and incidental contact with co-workers and supervisors.[82]

The "determination of residual functional capacity is the sole responsibility of the ALJ" and "[t]he claimant must show that he is so functionally impaired by his mental impairment that he is precluded from engaging in substantial gainful activity."[83] Here, substantial evidence supports the ALJ's determination regarding Plaintiff's nonexertional limitations. Despite diagnoses of adult antisocial behavior and a provisional diagnosis of mild mental retardation, Dr. Toldson concluded that

> Jeremy is capable of understanding, remembering and carrying out simple instructions; however, he may have some difficulty with complex or detailed instructions. He is able to perform simple repetitive tasks for two hour blocks of time. Jeremy should be able to sustain effort and persist at a normal pace over the course of a routine 40 hour workweek in the absence of episodes of anger. He may not relate well to others, including supervisors and co-workers or manage stress/pressure associated with day-to-day activities and demands because of his angry and hostile temperament.[84]

Similarly, while Plaintiff told Dr. Van Hook that he could not work because, in Dr. Van Hook's words, "work is difficult and he does not like criticism,"[85] Dr. Van Hook concluded that Plaintiff's "ability to understand, remember and carry out instructions was intact," "ability to maintain attention/concentration for performance of simple repetitive tasks was weak but thought tainted by his effort," and his "ability to respond appropriately to supervision and interact appropriately was reasonable…"[86] Dr. Van Hook also reported that Plaintiff's "ability to sustain effort and persist at

---

[82] AR p. 62.

[83] *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. June 28, 2012).

[84] AR p. 224.

[85] AR p. 237. *See also*, AR p. 235 (Plaintiff "said that he is not able to work today because 'the stuff be hard' and he reported having trouble with criticism.").

[86] AR p. 237. Dr. Van Hook did also note however that Plaintiff showed "weak social judgment and understanding of the general principles related to social situations." AR p. 237.

a normal pace over the course of a routine 40-hour workweek is perhaps mildly impaired from a psychological perspective by his history of learning problems" and that Plaintiff showed adequate stress tolerance during testing.[87]  Although Dr. Brown also noted Plaintiff's tendency toward anger and aggression, she recommended, *inter alia*, that Plaintiff be "counseled on different trade/vocational opportunities."[88]  None of these reports would indicate that Plaintiff lacks the capacity to have "less than occasional contact with the general public and incidental contact with co-workers and supervisors" as set forth in his RFC, and the limitations set forth by Dr. Ferrell in his Mental Residual Functional Capacity Assessment are consistent with the limitations as set out in Dr. Toldson's and Dr. Van Hook's reports.[89]  Moreover, and as correctly noted by the ALJ when considering Plaintiff's RFC, "while the evidence shows the claimant to have complained of anger issues and depression for many years, he has put forth little effort in obtaining mental health treatment to mitigate any symptoms he might currently experience."[90]  Accordingly, substantial

---

[87] AR p. 237.

[88] AR p. 214.

[89] Dr. Ferrell reported that Plaintiff was "moderately limited" in his ability to work in coordination with or in proximity to others without being distracted by them, his ability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  AR pp. 51-52.  Dr. Ferrell also reported that Plaintiff had "marked" limitations in his ability to interact appropriately with the general public and concluded that "Clmt retains the social interaction capacity for routine interactions with coworkers and supervisors limited from gen pub." AR pp. 51-52.  The ALJ assigned "great weight" to Dr. Ferrell's assigned limitations.  AR p. 68.  These limitations appear consistent with Dr. Van Hook's assessment that Plaintiff was able to respond appropriately to supervision and interact appropriately with others despite weak social judgment and understanding of general principles related to social situations.  AR p. 237.  Likewise, such limitations appear consistent with Dr. Toldson's evaluation that Plaintiff should be able to sustain effort and persist at a normal pace during the course of a 40-hour workweek in the absence of episodes of anger and that he "may not relate well to others, including supervisors and co-workers, or manage stress/pressure associated with day-to-day work activities and demand because of his angry and hostile temperament."  AR p. 224.  During the August 25, 2015 hearing, Plaintiff testified that he got a job at Mattress Direct through a temporary agency "loading the trucks with mattresses" and that he "got into it with people" following confusion about being hired permanently.  AR pp. 23-24.  Despite "getting into it," Plaintiff testified that he liked the work and that "I probably could have got adapted to it or whatever…." AR p. 26.

[90] AR p. 64.  *See*, AR p. 208 (Dr. Brown's evaluation; "Jeremy stated that he last took these medications in 2006 and has not received any mental health services in the interim."); AR p. 219 (Dr. Toldson evaluation; "Claimant is not currently taking medication."); AR 161 (Adult Function Report wherein Plaintiff stated that "I was taking medication when I was young and I started getting in a lot of trouble and people was lieing [*sic*] on me and getting me lock [*sic*] up in jail and I never took any medication no more.").  Although Dr. Van Hook reported that Plaintiff stated that he

evidence supports the ALJ's RFC determinations, specifically, the ALJ's determination regarding Plaintiff's mental limitations and ability to interact with the general public, co-workers, and supervisors.[91]

### C. The ALJ Did Not Err By Relying on the First of Two Hypotheticals Posed to the Vocational Expert

During the August 25, 2015 hearing, the ALJ asked the VE to

> assume an individual of Claimant's age, education and past work who has no exertional limitations, who could understand, remember, and carry out simple one and two step instructions, and who should have, quote, limited interaction with the general public and only routine interactions with coworkers and supervisors.[92]

The ALJ interpreted "limited interaction with the general public" as "less than occasional direct interaction with the public," and the VE clarified that to mean "incidental" interaction.[93] Based on this first hypothetical, the VE opined that there were jobs in the national economy which Plaintiff retained the appropriate RFC to perform.[94]

---

took medications "to keep me calm throughout the day," Plaintiff did not bring any medications with him, and Plaintiff also reported that "he has never received treatment for mental, nerve, psychiatric, or behavioral problems." AR p. 235. A July 21, 2015 letter from Lynn Schlossberger, a counselor at Family Services of Baton Rouge, indicates that Plaintiff was prescribed medication for anxiety and depression, but that such medications lapsed. AR p. 232. There are copies of two older prescriptions included in Dr. Brown's records. AR pp. 215-216. The administrative record does not contain any records of consistent treatment with any mental health provider. During the August 25, 2015 hearing, Plaintiff seemed to indicate that he was not taking any medications. AR p. 22 ("Q: Are you taking the medications? A: They ain't never called me to come get it yet.").

[91] *See*, *e.g.*, *Taylor*, 706 F.3d at 603 ("Here, substantial evidence supports the finding of the non-severity of Taylor's mental problems. A comprehensive medical exam revealed no evidence of Taylor's alleged mental health issues or any reason why mental problems would prevent him from engaging in gainful activity. In addition, the medical records showed that Taylor did not take any medications for his mental health complaints. He also failed to seek mental health care even after he was twice referred for mental health treatment at his request.").

[92] AR p. 35.

[93] AP p. 35.

[94] AR pp. 35-36.

On appeal, Plaintiff argues that the ALJ erred in relying on the VE's opinion regarding the first hypothetical, rather than the second, follow up hypothetical posed by the ALJ during the hearing:

> For my second hypothetical now I'm going to make the ability to deal with coworkers, supervisors and the public more severely restricted such that you could expect the person to have marked inability to tolerate even incidental contact with the general public, or respond appropriately to coworkers and supervisors, meaning you could expect some kind of negative, angry, hostile reaction with even minimal contact.[95]

In response to this second hypothetical, the VE opined that there was no work that the hypothetical claimant could do.[96] Plaintiff argues that it was reversible error for the ALJ to rely on the VE's opinion regarding the first hypothetical rather than the second.

"An ALJ's hypothetical is 'defective unless[:] (1) it incorporates reasonably all disabilities of the claimant recognized by the ALJ, and (2) the claimant or [his] representative is afforded the opportunity to correct deficiencies in the hypothetical.'"[97] It is reasonable for the ALJ to reject the testimony of the VE where the objective medical evidence ultimately does not support the limitations assumed in the hypothetical.[98] This court has explained that "[t]he ALJ is not bound

---

[95] AR p. 36.

[96] AR pp. 36-37.

[97] *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016) (citing *Bellow v. Charter*, 66 F.3d 323, 1995 WL 534955, at * 1 (5th Cir. Aug. 16, 1995) (unpubl.) (citing *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994) (explaining that the test in the Fifth Circuit "for determining when a defective hypothetical question will produce reversible error" is "[u]nless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.")). Plaintiff recognizes this standard. *See*, R. Doc. 13, p. 11 ("Hypothetical questions posed by the ALJ to the VE at a disability hearing are to reasonably incorporate all disabilities of the claimant recognized by the ALJ and the claimant, or his representative, is afforded an opportunity to correct any deficits in the ALJ's hypothetical questions.").

[98] *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (explaining that because the ALJ "found objective medical evidence did not coincide with the hypothetical assumptions posed to the vocational expert," the ALJ reasonably rejected the vocational expert's opinion based on those hypothetical assumptions); *Stone v. Commissioner of Social*

by the VE's testimony based on hypothetical limitations that the ALJ ultimately rejected as unsupported by the record."[99]

Plaintiff argues that "consistent with the ALJ's second hypothetical, the record is replete with references to plaintiff's problems getting along with others, a fact indicative of the import of plaintiff's inability to work cooperatively with others in the workplace."[100] Plaintiff further asserts that there is a "clear absence of record evidence supporting the view that claimant <u>does not</u> have marked social interactional limitations…."[101] Here, the first hypothetical posed to the VE more closely comports to the ALJ's ultimate RFC determination, which as discussed above, was supported by substantial evidence. Accordingly, the ALJ's reliance on the first hypothetical posed to the VE rather than the second is not reversible error.[102]

## VI. Conclusion

The analysis above demonstrates that Plaintiff's claims of reversible error are without merit. The record, considered as a whole, supports the finding that the ALJ applied the proper

---

*Security Administration*, No. 14-11982, 596 Fed. Appx. 878, 879 (11th Cir. Jan. 8, 2015) ("The Fifth Circuit has held that it was reasonable for an ALJ to reject expert testimony where the objective medical evidence ultimately did not coincide with the hypothetical assumptions posed to the VE. The Ninth Circuit also has held that an ALJ was free to accept or reject restrictions in a hypothetical question that were not supported by substantial evidence, even when the hypothetical was posited by the ALJ and not counsel.") (internal citations omitted).

[99] *Siewert v. Colvin*, Civil Action No. 15-476, 2016 WL 7478968, at * 11 (M.D. La. Dec. 29, 2016) (citing *Owens*).

[100] R. Doc. 13, p. 14.

[101] R. Doc. 13, p. 16.

[102] *See*, *Vaught v. Astrue*, 271 Fed. Appx. 452, 456 (5th Cir. 2008) (unpubl.) (finding no reversible error and explaining that plaintiff's "argument amounts to a disagreement with the ALJ's residual function capacity determination, but that determination was supported by substantial evidence."); *Swan v. Colvin*, Civil Action No. 15-60, 2016 WL 5429669, at * 17 (M.D. La. Aug. 30, 2016) ("Although the ALJ's decision does not mention the hypothetical question posed by Plaintiff's counsel, the court has found that the ALJ's RFC determination, without the additional limitations proposed by Plaintiff's counsel, is supported by substantial evidence. Thus, Plaintiff's allegation of error is without merit."); *Keller v. Astrue*, Civil Action No. 12-335, 2013 WL 5408987, at * 8 (M.D. La. Sept. 25, 2013) ("Despite Plaintiff's suggestions, the ALJ's opinion took into consideration her counsel's hypothetical questions. (Tr. 24). The ALJ discredited them, however, because they incorporated the same limitations the ALJ had previously found not credible. The court has found that the ALJ's RFC determination, without the limitations proposed by her counsel, was supported by substantial evidence. Therefore, Plaintiff's allegation of reversible error is without merit.").

legal standards and that substantial evidence supports the determination that Plaintiff was not disabled. Accordingly, under sentence four of 42 U.S.C. § 405(g), the final decision of the Commissioner of the Social Security Administration denying the application for supplemental security income filed by plaintiff, Jeremy Robertson, is **AFFIRMED** and this action is **DISMISSED**.

Signed in Baton Rouge, Louisiana, on March 28, 2019.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**